**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHEAL C. KALASHEH,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 2:25-cv-05103-JDW** |
| | : | |
| **VERDANTAS LLC,** | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

Micheal C. Kalasheh's original complaint had too little detail. His Amended Complaint has much more (maybe too much), but it's still short on critical details. I will give him a final opportunity to file a second amended complaint to fix these errors and file a complaint that asserts plausible claims based on his tenure at Verdantas LLC.

**I.      BACKGROUND**

Verdantas hired Mr. Kalasheh for a position as a mechanical engineer, and he began work on April 15, 2024. Prior to his start date, he informed the recruiter and an employee of Verdantas that he had ADHD and Chronic Regional Pain Syndrome ("CRPS"), and he made similar disclosures on his voluntary self-demographic forms. He disclosed these conditions in case his medications appeared on any drug screening, but he said he did not need any accommodations, nor did the conditions affect his ability to do his job. On his first day of work, he informed his supervisor, Walter Stout, and others at the company about his ADHD and said it might cause him to send very long communications.

Mr. Kalasheh alleges that he had a colleague with ADHD who Verdantas subjected to negative treatment. Mr. Kalasheh steered clear of the situation because he did not want to become a target himself. At some point, he had a meeting with Mr. Stout, which he thinks was related to his colleague, after which Mr. Stout began to criticize him. Verdantas terminated the colleague on June 10, 2024. On June 24, 2024, Mr. Kalasheh mentioned the colleague's termination to two members of his department, Joseph Pitsko and Lee Comstock, which Mr. Kalasheh suspects made him a target.

On June 25, 2024, Mr. Kalasheh went to a "client's government facility for a site inspection," along with Mr. Pitsko, Mr. Comstock, and Erony Martin. (ECF No. 8 at 10.) Mr. Kalasheh learned of "at least 12 known cases of carbon monoxide poisoning that had occurred at the facility," and he "saw several severe OSHA life safety issues." (*Id.*) Mr. Kalasheh believed there was a "major problem at this facility," so he "put together all the codes/standards and commentary and presented it to [his] project team the following day." (*Id.*)

A project team meeting on June 26, 2024, included Messrs. Kalasheh, Pitsko, and Comstock. Mr. Kalasheh asserts that he "was subject to harassment and an increasingly hostile workplace that began in [this] meeting." (*Id.*) He alleges that Mr. Comstock "unethically began to bully and belittle [him] and [his] competence with false statements about the requirements for that facility." (*Id.*) Mr. Pitsko told Mr. Kalasheh "that [he] had to provide everybody in [the] group [with] the proper code source material ... to address

[the] carbon monoxide and ventilation system issues at this facility." (ECF No. 8 at 10.) Mr. Kalasheh provided the requested material and "asked politely for the group to please trust in [his] competency …, as opposed to trying to prove [him] wrong." (*Id.*)

The next day, Mr. Kalasheh "received a threatening phone call" from Mr. Pitsko, complaining that Mr. Kalasheh had sent Mr. Pitsko a "thesis." (*Id.*) Mr. Kalasheh told Mr. Pitsko that he "felt harassed and belittled," and he "refused to compromise [his] ethical duties as an engineer just to satisfy the client." (*Id.* at 11) Mr. Pitsko said they "could move past this," but he "warn[ed]" Mr. Kalasheh that Verdantas "was not in the business of hiring, nor interested in keeping around assholes." (*Id.*)

Mr. Kalasheh sent Mr. Stout a message the next day to report that he "was being harassed and threatened." (*Id.*) He reminded Mr. Stout of his ADHD and CRPS and told him that "a hostile workplace situation like this was not helpful towards [his] management of existing ADA conditions." (*Id.*) He then spoke on the phone with Mr. Stout "to discuss what [Mr. Kalasheh] had reported to him," but the call did not go well. (*Id.*) Based on that call, Mr. Kalasheh concuded that Messrs. Stout, Pitsko, and Comstock planned to complain to HR about Mr. Kalasheh to get him fired.

After this call with Mr. Stout, Mr. Kalasheh contacted HR and explained that his CRPS could flare up due to a hostile workplace. He asked for HR to investigate, for the remainder of the day off, and for HR to communicate to a supervisor that Mr. Kalasheh "would be unavailable to work that weekend." (*Id.* at 11-12.) Over the next several days,

3

HR Representative Kellie Brewer contacted Mr. Kalasheh numerous times to set up a call. Mr. Kalasheh told her that he "preferred to have everything in written correspondence only." (*Id.* at 12.)

On July 1, 2024, Ms. Brewer granted Mr. Kalasheh time off but "persisted" in her request to speak with him, stating that "she had all the information and completed her investigation" into his allegations, but "she needed to have a phone call with [Mr. Kalasheh] before she could allow [him] to return to work." (*Id.*) Mr. Kalasheh then "felt that [he] had [to] express[] to her [his] living situation, and history of being a domestic abuse victim, and [his] fears of [his] abuser in [his] house finding out about this situation." (*Id.* at 13.) Mr. Kalasheh alleges that "[Ms.] Brewer ha[d] the Northampton Township Police Department sent to [his] home for a 'welfare check.'" (*Id.*) He then sent an email to Ms. Brewer and "a number of executives within the company," demanding to know why he was not allowed to return to work and what kind of leave he had been granted, reiterating that he had not made "a request for accommodations, and that it was a hostile workplace," and stating that by sending the police to his house, Ms. Brewer had "knowingly put [him] in danger of future domestic abuse." (*Id.*)

On July 3, 2024, Ms. Brewer emailed Mr. Kalasheh to tell him that he was required "to undergo a Mandatory Medical Evaluation," and to call her to discuss his availability for this exam. (*Id.*) At some point between July 11 and 15, 2024, Mr. Kalasheh reported Ms. Brewer to HR "for Harassment, Hostile and Pervasive conduct and a failure to investigate

as well as violation of [his] rights as a protected individual, intimidation, interference, and disability discrimination." (ECF No. 8 at 15.) On July 15, 2024, he received an email from Ms. Brewer stating that he had to submit to the medical exam "within just a few hours," or he would be terminated. (*Id.*) On July 16, 2024, he contacted two other Verdantas employees "to request discussions of a mutual separation agreement," but he received an email from Ms. Brewer that same day "terminating [his] employment as a result of not going to that illegal mandatory medical evaluation." (*Id.*)

Mr. Kalasheh indicates his intent to bring claims under the Americans with Disabilities Act and the Pennsylvania Human Relations Act for termination of his employment and retaliation, among other purported causes of action.[1] Mr. Kalasheh

---

[1]    Mr. Kalasheh named Verdantas as the lone Defendant in his original Complaint. However, in his Amended Complaint he names numerous individuals as Defendants but does not appear to name Verdantas itself. The ADA only addresses discrimination by employers, not individuals. *See Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 299 (3d Cir. 2017). Mindful of Mr. Kalasheh's *pro se* status, I will construe his ADA claims for present purposes as asserted against Verdantas.

Unlike its federal counterparts, the PHRA provides for liability against individual defendants when those individuals "aid, abet, incite, compel or coerce" any act that the PHRA designates an "unlawful discriminatory practice." 43 Pa. Cons. Stat. § 955(e). Nonetheless, individual liability under the PHRA is narrow and only applies to "supervisory employees." *Dici v. Commonwealth*, 91 F.3d 542, 553 (3d Cir. 1996). Supervisors face liability under the PHRA in two circumstances: (1) when the supervisor knew or should have known that the plaintiff was being subjected to discrimination but repeatedly failed to take prompt action to end the discrimination, or (2) when the supervisor engages in his or her own acts of discrimination against the employee. *See id* at 553. Kalasheh has failed to state a claim for relief against any individual for the reasons explained in this Memorandum. If Kalasheh chooses to file a second amended complaint, he should be mindful of these points in deciding which parties to name as Defendants.

5

asserts that he filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 6, 2025, and received a right-to-sue letter on June 4, 2025.

## II.    STANDARD OF REVIEW

Because I have granted Mr. Kalasheh leave to proceed *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) requires me to dismiss the Amended Complaint if it fails to state a claim. That inquiry applies the standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Pursuant to that standard, I must determine whether the Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). That means I must accept the factual allegations in the Amended Complaint as true, draw inferences in favor of the plaintiff, and determine whether there is a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021). Conclusory allegations do not suffice. *See Iqbal*, 556 U.S. at 678. "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). "A complaint that pleads facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up). When a plaintiff is proceeding *pro se*, I construe his allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

## III.    ANALYSIS

### A.    Scope Of Pleadings

In addition to his Amended Complaint, Mr. Kalasheh submitted hundreds of pages of exhibits. "While a court may consider exhibits attached to a complaint, merely attaching exhibits is insufficient to meet the requirement that a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Berkery v. Credit Collection Servs.*, No. 21-3809, 2021 WL 4060454, at *2 (E.D. Pa. Sept. 7, 2021). The Amended Complaint does not provide specific citations to the many exhibits; instead, the exhibits are repetitive and disjointed reproductions of various communications Mr. Kalasheh had via text and email, a Verdantas employee handbook, and a document that Verdantas filed in response to Mr. Kalasheh's EEOC charge, which Mr. Kalasheh marked up with extensive marginalia and rebuttals. It's not my job to read through the mish-mash of exhibits that Mr. Kalasheh submitted to figure out if he has enough information to state a claim.[2] *See Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006). I have therefore not considered the exhibits unless they clearly relate to one of Mr. Kalasheh's claims.

---

[2]    Nor am I required to craft arguments for Mr. Kalasheh. "[T]he special judicial solicitude with which a district court should view ... *pro se* [filings] does not transform the court into an advocate[.]" *United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012) (quotation omitted).

**B.      Plausibility Of Claims[3]**

**1.      Disability discrimination and hostile work environment**

To state a claim for employment discrimination under the ADA[4], a plaintiff must allege that he has a disability within the meaning of the ADA, he was "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and []he suffered an otherwise adverse employment decision as a result of discrimination." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220-21 (3d Cir. 2024) (quotation on mitted). A person is disabled within the meaning of the ADA if he (1) has '"a physical or mental impairment that substantially limits one or more' of their 'major life activities'; (2) ha[s] 'a record of such an impairment'; or (3) [is] 'regarded as having such an impairment.'" *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020) (quoting 42 U.S.C. § 12102(1)).

To state a claim for a hostile work environment in the context of the ADA, a plaintiff must allege that (1) he is a qualified individual with a disability under the ADA; (2) he was

---

[3]      In his Amended Complaint, Mr. Kalasheh cites the federal Whistleblower Protection Act, but he does not allege with specific facts that he did work for an entity of the federal government, that he made a protected disclosure to an appropriate official about that work, or that he made any attempt to exhaust his administrative remedies as to any whistleblower claim. *See DuPage Reg'l Office of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 350 (7th Cir. 2023); *see also* 41 U.S.C. § 4712(a)-(c). Any such claim is therefore not plausible.

[4]      "[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010) (citation omitted). Thus, throughout this Memorandum, I refer to the ADA only.

subject to unwelcome harassment; (3) his employer harassed him because of his disability or because of a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to cause an abusive working environment; and (5) the defendant employer knew or should have known of the harassment and failed to take prompt effective remedial action. *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999).

In dismissing Mr. Kalasheh's original Complaint, I explained that "label[ing] his termination wrongful and say[ing] that he endured a hostile work environment, discrimination, and retaliation … are legal conclusions, not factual allegations." (ECF No. 6 at 6.) Although Mr. Kalasheh has included many more facts in his Amended Complaint, it still contains this conclusory language at the very points where it needs factual detail. But I am "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). For example, Mr. Kalasheh claims that he "was subject to harassment and an increasingly hostile workplace" and that Mr. Comstock "un-ethically began to bully and belittle [him]." (ECF No. 8 at 10.) But he includes no facts to support those conclusions, such as what Mr. Comstock *said* or *did* that amounted to "bullying" or "belittling." The only facts about what happened in the meeting on June 26 are that Mr. Kalasheh informed his coworkers of his belief that there was a problem at the facility they had visited the previous day. Mr. Pitsko asked him to

9

provide "the proper code source material" so that they could address it, and Mr. Kalasheh asked the others to "trust in [his] competency."  (ECF No. 8 at 10.)

That's not enough to establish either disability discrimination or a hostile work environment. While Mr. Kalasheh has provided a long narrative statement about what happened leading up to the meeting on June 26, he has not pled facts that establish that anyone made a decision about his employment based on his disability. He just asserts it without any factual detail. Nor has he pled facts that establish a severe or pervasive pattern of mistreatment on the basis of his disability. However, I will give Mr. Kalasheh one more chance to submit a pleading that alleges the required elements. I caution him that just putting down a lot of words on the page is not enough. He must include factual details that allow me to determine that he has alleged facts to establish the elements, and I urge him to focus his allegations only on the facts that I need to make that determination.[5]

---

[5]    I have also considered whether Mr. Kalasheh intended to plead a "regarded as" claim under the ADA. Pleading in the alternative that one has an actual disability and that one is "regarded as" having such a disability is not impermissible or necessarily mutually exclusive. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 189 (3d Cir. 1999). However, I cannot construe Kalasheh's Amended Complaint as pleading a "regarded as" claim because, as described above, he states that he communicated to Verdantas both generally that he had conditions qualifying as disabilities under the ADA and specifically that his absence from work beginning on June 28 was due to his conditions limiting his ability to work, so he has only attempted to plead an "actually disabled" claim. *See Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 514 (3d Cir. 2001).

### 2.    Failure to accommodate

Discrimination under the ADA "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). A plaintiff alleges failure to accommodate by asserting facts that raise a reasonable inference that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

Mr. Kalasheh alleges that he did not seek any "accommodations" on the basis of his ADHD and CRPS.  (ECF No. 8 at 7, 13.) However, his claim appears to be that he told his employer, supervisor, and coworkers that his ADHD made him prone to long written communications; he "apologized ahead of time" for that proclivity; and yet he faced criticism after the meeting on June 26, and at various other points during his employment, on that very basis, which he in describes in conclusory fashion as harassment and a hostile work environment. (*Id.* at 7-8, 10-11.) So, Mr. Kalasheh asserts both that he did not require any accommodation and that he made a request that amounts to an accommodation: he wanted his supervisor and co-workers to excuse his overlength communications because they are a manifestation of his ADHD. He can't have it both ways. If he didn't ask for an

accommodation, as he claims, then the company didn't fail to accommodate him. Mr. Kalasheh will have to make up his mind if he files a second amended complaint whether he requested an accommodation and, if so, whether he thinks that Verdantas failed to accommodate his disability.

### 3. Retaliation

The ADA retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge … under [the ADA]." 42 U.S.C. § 12203(a). A plaintiff states a retaliation claim if he "pleads sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the following elements: (1) []he engaged in conduct protected by Title VII [or here the ADA]; (2) the employer took adverse action against [him]; and (3) a causal link exists between [his] protected conduct and the employer's adverse action." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).[6] A general complaint about unfair treatment does not constitute protected activity; a plaintiff must show that he complained specifically about unlawful discrimination. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995). Mr. Kalasheh has not pled facts to support the first element, at a minimum.[7]

---

[6]    Courts analyze ADA retaliation claims under the same framework as retaliation claims arising under Title VII. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

[7]    Requesting a reasonable accommodation under the ADA also constitutes protected activity. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003). However, because Mr. Kalasheh pled that his request for PTO "wasn't a request for

Mr. Kalasheh alleges that he complained to Mr. Stout, Mr. Pitsko, and later Ms. Brewer and other HR representatives that he had suffered harassment and a hostile workplace and that the stress impacted his CRPS and ADHD. But he does not allege that he told anyone that the reason for his mistreatment had anything to do with his disabilities. Reporting that the workplace exacerbated his disabilities is not the same as, or enough to satisfy the requirement for, reporting disability-based discrimination. *See Barber*, 68 F.3d at 702. The ADA does not impose a general civility code in the workplace, so if Mr. Kalasheh elects to proceed with his claim, he must include facts that might establish that he complained about discrimination on the basis of his disability (and that Verdantas took some action against him as a result).[8]

---

accommodations," (ECF No. 8 at 13), I have not considered whether he has stated a retaliation claim based on this request.

[8]     Mr. Kalasheh claims that Verdantas violated his rights by ordering him to undergo an FFD evaluation after his disabilities rendered him unable to perform his job. It's not clear from the Complaint whether Mr. Kalasheh claims this was a retaliatory act or was an independent violation of the ADA under some other theory. An employer may require an employee to undergo a medical examination without violating the ADA if the exam is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "[W]hen health problems have had a substantial and injurious impact on an employee's job performance, the employer can require the employee to undergo a physical examination designed to determine his or her ability to work." *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) (citation omitted). Based on that, I can't conclude that the FFD was unrelated to his job or inconsistent with business necessity. It's therefore not plausible as a standalone claim of discrimination. If he intends to claim that it was a retaliatory act, he needs to be more explicit about that allegation.

## IV.   CONCLUSION

I will dismiss the Amended Complaint without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. Mr. Kalasheh may file a second amended complaint. If he does so, it must contain sufficient clarity "to avoid requiring [me] or opposing party to forever sift through its pages in search of the nature of the plaintiff's claim[.]" *Glover v. F.D.I.C.*, 698 F.3d 139, 147 (3d Cir. 2012) (internal quotation omitted). An appropriate Order follows, which provides further instruction about amendment.

**BY THE COURT:**

*/s/ Joshua D. Wolson*

**JOSHUA D. WOLSON, J.**

March 17, 2026

14